Good morning, Mr. Chief Judge Thomas, and may it please the Court, I'm Daniel Kavlin. I represent the appellant, Dennis Mahon, and I am going to watch the clock and try to save about five minutes from my rebuttal. The indictment in this case could not have been clearer about identifying the target of the attack that was the basis of Count II and a part of Count I. It identified the City of Scottsdale Office of Diversity and Dialogue. In the government's closing argument, the prosecutor described that office as one devoted to the purpose of building a community that valued diversity. The webpage contemporaneous with the attack was an exhibit at the trial. The webpage described the office's mission as cultivating an environment where differences are valued, respected, and embraced. These are worthwhile goals, but what they are not is descriptions of a trade or business that could justify the application of Section 844I. Your Honor? Yeah, I was just wondering whether your argument is advanced by saying that we're not talking about the overall building that's owned by the city, but we're just talking about the office. The office seems to be the one that's engaged in promoting activities and bringing tourists and whatever, and the building is owned by the city. It's a little harder to argue that the operation of the building and the city itself is there to, you know, promote the regular police actions and activities of the city, tax collection work and whatever, but I don't know whether it's helpful. Well, first of all, I don't know whether it's right, but I don't know whether it's helpful from your standpoint to limit it to the Office of Diversity. so to speak, administrative assistance for a nonprofit group called Community Celebrating Diversity to organize community events celebrating Martin Luther King Day, Hispanic Heritage Day. Well, they sell tickets, they hire speakers, a lot of things that are associated with commercial activity. Well, Your Honor, as I said, they were a middle organization transferring money back and forth from CCD, that's Community Celebrating Diversity, and also for the city of Scottsdale. However, although those activities involved money changing hands and tickets being sold, they were all in the service of a noncommercial, nonbusiness purpose, which was to organize community events. It is essentially similar to the many cases that deal with attacks on churches. In this court, there's the Lamont case. In the Fifth Circuit, Your Honor, was on the panel for the Johnson case. The church attacks in Johnson was involved in monetary transactions where donations were sent to a regional organization. The regional organization transferred donations throughout the church's ministries around the world. In Lamont, it was clear, this court pointed out that a church may be involved in all kinds of monetary transactions, building structures and sponsoring events, but if it's all done in service of a noncommercial purpose, it's simply a noncommercial organization existing and doing what it does. So under your view of the case law, would Goodwill not qualify under 844i? Goodwill the stores, you mean? Goodwill stores? Well, like the organization that accepts donations to help people improve their lives, overcome drug addiction and so forth. Would they not be? Well, Goodwill would be a much harder case to make because, you know, if I'm understanding you, the stores that you see a lot of places these days actually sell used clothing and books and DVDs and so forth. Fair enough. Let's say the donation center where you don't buy anything there. You simply donate goods so they can help better people's lives. Not a commercial purpose. The purpose of Goodwill is not to make money. It's to help the people who work there turn their lives around. I would think that would be harder to justify than just the donation center as being covered by 844i. And, you know, there's a significant point to bear in mind here, and obviously the lead case is the Supreme Court's Jones opinion. They were very emphatic in that case about the weighty principles that are weighing against a broadening interpretation of 844i. If it were just a matter of taking the language of the statute at face value with none of those concerns in mind, it might be an easy thing to say, well, a church in the Fifth Circuit affects commerce because all this money changes hands, and a government office in Scottsdale affects commerce. But the Supreme Court refused to do that because there is the Bass principle of not lightly assuming Congress intended to upset the federal-state balance in terms of the prosecution of crimes. They would have done it. It's not a complete ban. It's a complete ban if there is, in fact, no nexus sufficient. In other words, for instance, marijuana or prohibited weapons, some of the automatic rifle stuff has been upheld on the basis that it either travels or affects marijuana, affects interstate commerce, and policing conduct like that has traditionally belonged to the state. So it's not a complete ban, what it is. What it seems to me in those cases, they said, well, that's not the type of nexus that you can, that's not really commerce. That's not really something that affects interstate commerce. So otherwise, you just say, well, this just deals with local things, and therefore the case is over. So in that, what we're going to boil down, this case is going to be boiled down to, is the type of activities that are involved here in this building and the purpose for which they are undertaken. Are they sufficient that they actually provide that nexus that make it okay, both in a statutory sense and in an application sense, to prosecute your person, or is this really just something that really isn't commerce or an instrument of commerce? That is the question I believe the Court needs to address, and no, this is not something which shows. In the Jones case, the Supreme Court said the key language is used, and the key word is used. It's the question of was this office. Again, I am focusing on the Office of Diversity and Dialogue and the office space and the physical space that that office was in. Perhaps the Court won't do that. Either way, the question will be, is this property used in commerce? And the Supreme Court in Jones again said, we can't give a broad interpretation to affecting commerce as anything that literally could be said to affect commerce. Even the affecting commerce part of the statute only applies to something which is actively used in commercial activity, not noncommercial activity. So of what significance is it that there is a store, a city store in the building, which I presume does not sell packaged liquor? The record does not suggest it does. So the first answer is it shouldn't even, under the argument I'm making, which the Court may not accept, you would be this Court. I know your argument is it's confined to the office, but if we're looking at the whole building, of what significance is it that there's a store there? Well, it potentially could be of significance if the record showed that that store was engaged not only in commerce, but in interstate commerce. The record simply doesn't have evidence of that. Now, there are cases that are in the church context that are somewhat similar, where there was a commercial function on a church property, and it was shown specifically by evidence that that commercial use involved interstate commerce. It simply didn't happen in this case. Well, how about the duplex, where a person owns part of it and he rents part of it? You don't take the fact that he lives in part of it to say it's a private dwelling, therefore, but the Court has looked to the fact that he rented the other portion and said, well, that's commerce. If this were a situation, and the rent-a-ria, for example, is a case, there was a church in that case, and part of the broader church property, it had a store, and the store was used by the church as rental property because they literally rented it to somebody to run that business. And this Court said that in that situation, that property was used in commerce under Jones. That was a post-Jones decision. So in that situation, if it were proper to look at the whole structure, then yes. Just a brief hint back at my first argument about the constructive amendment, the Carlson case, the Adamson case, the basic principle is, perhaps the grand jury could have decided to indict an attack on 7575 East Main Street. That's the building. But they didn't do that. They chose to indict Office of Diversity and Dialogue. This would be a different case in terms of that constructive amendment argument if they had indicted the first way. Because they didn't indict that way, there is that restriction. So I'd certainly like to address that further if the Court would like to. But the basic — but what the Court is asking about is the city store. The other use in the same physical structure in the same building was the human resources. Those were essential personnel functions. Any church presumably would have personnel functions. They would pay salaries. They would decide what the salary price points should be. They might have events and bring in speakers. The fundamental problem with that type of evidence is it doesn't show that it's a property that's used in commerce. Now, the government has pointed to the fact that the entity operating some kind of operation as a commercial entity being considered to be in commerce or being a commercial function that could be under the Commerce Clause. It's important to draw a distinction between the scope of the commerce power and the scope of 844I because the Supreme Court made it plain in Jones, and it's further reiterated in Lamont, that Congress did not intend, as was previous to Jones believed, to exercise its full commerce clause power in 844I. Because of the importance of the Bass Principle, the federal-state balance, because of the importance of the importance of not even raising a serious constitutional issue, if you can avoid it through interpretation, because of the rule of lenity, that statute had to be construed narrowly. And in order to construe the statute narrowly, it is required to require actual commercial use of the property. Now, the problem with just saying, well, the fact that it's nonprofit doesn't necessarily end the story is, I don't dispute that. But if a nonprofit organization, as in the Camp's newfound case, is running what looks for all intents and purposes, it walks like a duck and quacks like a duck, like a private for-profit summer camp, it just happens to be a nonprofit, perhaps the argument in a Goodwill store as opposed to a donation center is it walks and quacks like a store selling used clothing, you know, then you have a nonprofit group, a nonprofit entity that engages in essentially commercial business competing with other commercial businesses and part of an interstate market in that same basically fungible commodity, what could be covered in terms of the commerce power and perhaps could be covered under 844I. But my argument is not simply that the government doesn't operate for profit. My argument is this is not what would, under a lot of circumstances, certainly there are transactions, there are people who are paid to come and speak by that nonprofit group, the D&D office was involved in shuttling that money back and forth, but it didn't turn them into a business. Now, this is an argument that is initially focused on count two, the bombing count. The count one, of course, was a much broader conspiracy that was alleged to have gone on for many years, but both of these counts are fatally flawed by the failure of the evidence to show the commerce link under Section 844I. The statutes that underlie count one are 844N, which is conspiracy to violate another subsection, and 844I, the statute applied to the bombing. If there were any other evidence in the record to suggest that other targets beyond the D&D office slash perhaps the building were involved in the bombing, the building it was in, would satisfy the used in commerce test in Jones, then perhaps you could say count one could survive even if count two does not. There is no such evidence. The targets that are in the rest of the count one conspiracy, there was a fictional child molester, and that doesn't even count because that was between Dennis Mahon and the confidential informant who they can't be a conspiracy between an individual and a government informant, and there were some very vague open-ended references to the power grid, but what an actual target in terms of the power grid would have been was never specified in any of the evidence. It was simply broad, vague references. Whether any part of a power grid could qualify is dubious, but there's no point even addressing it because there's no particular target identified to assess under 844I in Jones. If there are no questions at the moment, I will reserve the balance of my time. Thanks, counsel. Good morning. Joan Rufinock, District of Arizona, on behalf of the United States. Your Honors, this is not a bombing by a jolted lever. This is a bombing that was an act of domestic terrorism that targeted Donald Logan and the Office of Diversity and Dialogue of the City of Scottsdale because the views of that office and of Mr. Logan conflicted with those of the defendant and with the white Aryan resistance, and the building that houses the Office of Diversity and Dialogue was damaged in the process, and that building... The building was damaged in the process because the building was used in interstate commerce, and it affects interstate commerce. Now, what gets this... Get to why this is a federal offense. It's a federal offense because the building was used in interstate commerce, and it affects interstate commerce. My opponent is discussing commerce and commercial activity, but the Supreme Court and the Ninth Circuit have recognized it's not just commercial activity, it's also economic activity. And if you look at the cost of being produced out of that building, it was tremendous. One thing I'd like to point out is with respect to the facts in the government's brief regarding this issue, they all apply from 2003 through 2009, the entire time of the conspiracy, unless otherwise noted. During that time, this building was housing the Human Resources Office. And another point I'd like to make, the building itself is a single-story building, and I imagine that the building is a single-story building. I invite the Court to look at Exhibits 112 and 113, which are photographs, and those photographs show that there's the entryway into the building, and you can see the lobby through there. The store is located right there in the lobby. If you turn to the left and you go down four offices, you come to the Human Resources Director's Office. The fifth office next door belonged to Donald Logan. So to say that they are somehow separated is an incorrect statement. In fact, they share a common wall. But, counsel, I appreciate the proximity between them, and I think your brief does a good job of laying that out. The concern I have with that is that the indictment doesn't make that, doesn't describe it that way. The indictment focused on, rightfully so, on Mr. Logan and his office. But it doesn't, unless you can point me to somewhere in the indictment, it doesn't say that the intent was to blow up the building. It was to blow up the building. Right. And the Office of Diversity and Dialogue is an entity. The same way that the Court discussed in Lamont, where you have the church as an entity and the church as a building. The indictment gave notice pleading. It told where within the physical building itself the bomb caused the damage. It caused it, it was directed at the Office of Diversity and Dialogue. The Office of Diversity and Dialogue isn't a building. It's a physical office. I mean, Mr. Logan had an office. There were cubicles across the way. It had an area, but it shared the area with human resources. In fact, as the defense acknowledged in pleading CR 395, they said that the Office of Diversity and Dialogue is a subdivision of human resources. And when they asked the court, the district court, to consider the subdivision of human resources, they said that the Office of Diversity and Dialogue was the building that houses HR and its subdivision, the Office of Diversity and Dialogue collectively the building. So the defense recognized that it was the building, and specifically within the building where the bomb exploded, was the Office of Diversity and Dialogue. My question, though, counsel, if you go back to Lamont, if in Lamont, let's say, there were soda machines or candy machines at the time when the church was bombed, the fact that the soda machines or candy machines were destroyed in this bombing, that would not be sufficient, as I read Lamont, to then convert that into a satisfying 844-I, because the thing that was targeted was the church, not the soda machines. Right. And you look at what is the business of the church, what is the business of the building. The business of a church is human resources function. In this case, the business of the building is human resources function. It manages the employees for the entire city of Scottsdale, and we can infer that it's a very large workforce from the fact that it had a $700,000-a-day payroll in 2008 and 2009. Is there anything in the indictment that says that the plot here was, because it's a conspiracy count, so was there a plot to blow up the building? No, but I suggest that it doesn't need to be, because it read 844-I, and 844-I expressly says, whoever maliciously damages or destroys or attempts to do so, any building, vehicle, other real or personal property. So it had to be real or personal property or a building. The building in this case was the HR building that housed the Office of Diversity and Dialogue. Let's assume for the sake of argument that your interstate nexus proof is limited to the Office of Diversity. What do you have? We have significant activity. Mr. Logan testified that he was a member of the Chamber of Commerce of every single minority group in the city. The reason that he was a member of the Chamber of Commerce for each was because the city of Scottsdale wanted to be seen because it is a tourist destination as a welcoming and diverse place that welcomed small businesses and wanted small businesses to come to Arizona because of its diversity and invest in the city of Scottsdale. In addition, the case law has looked at I don't think local membership alone gets you there. Local membership in an Eagles Club, I guess, or Rotary Club or Chamber of Commerce, I don't think that's going to cut it. I'm sorry, that's certainly not it. But in addition, a second purpose of the office was to put on cultural festivals and cultural events. And those numbered, the participants numbered anywhere from the hundreds to the thousands of people that attended these events. They had corporate sponsors. And to the extent that opposing counsel is attempting to make these like a church, they're not. As I said, the business of the church is spiritual guidance. The business of the Office of Diversity and Dialogue is to make Scottsdale a more welcoming place for people to come to Scottsdale, to encourage and embrace diversity. So they held these events. They charged money for these events. They brought in nationally known speakers for these events, paying up to $15,000 a day. These were not operational expenses to run the Office of Diversity and Dialogue. The City of Scottsdale paid for that. The City of Scottsdale housed them in one of their buildings. The City of Scottsdale paid the salaries for Mr. Logan and for his employees. It seems that there's a, maybe it's my problem, I'm having a problem with equating purpose with activity. And it seems to me you kind of go switch back and forth. Their purpose is to promote diversity. All right? That doesn't seem to make sense. That doesn't seem to be a, if you're divorcing the two, that doesn't seem to me to be a conduct in the inner sake, an instrumentality or an activity, an instrumentality. Now, if we're talking about activity and separate it from the purpose, then you're saying, well, we put on programs. We want to promote the purpose of diversity, but that's, you know, that's, that's just your purpose. I don't know if that has anything to do. It's not, you're not, you're not trying to manufacture something. You're not trying to sell something. You're, it's not the normal type of things that we associate with commerce. But what I guess is what I'm saying, if you, if you remove purpose from it and just only look to activity and you could just take anything that has some connection to commerce, then that's exactly what Lopez and Morrison were trying to get away from, weren't they? They're saying there has to be some bounds, otherwise you have this, there's no limits at all to the power of Congress under the Commerce Clause. I can't see, it seems to me that you're just pointing out there are activities to try to make their purpose business or an instrumentality. It's, it's kind of a joint purpose. I want the world to be good, and I don't want people to hate each other, and I want them to be nice to each other, and even when they're feeling bad like I am today, for me not to be grumpy. But all those purposes that I might have is any activity that I do that might touch somebody in some other state, make, make those things affect interstate commerce or make them an instrument of interstate commerce? Not in general, but what I'd like to bring the Court back to is this was one of the first offices of diversity in the United States, and for that reason, it received publicity. It was brought to the city of Scottsdale by the Department of Tourism, a tourist destination, because Scottsdale wants to sell itself around the United States. Scottsdale, in order to do that, had the Office of Diversity and Dialogue, whose purpose was to put on these events to make Scottsdale a welcoming place for everyone, to make it a place that people would want to come and move to, to make it a place people would want to come and have small businesses. So the office itself was involved in a number of economic activities, and those activities included putting on the Martin Luther King event, that, you know, thousands of people, or I'm sorry, hundreds of people went to the dinner itself, but you had activities throughout the day where the speakers participated. And again, national speakers brought in to Scottsdale for up to $15,000 a day to put on paid programming at a resort hotel in Scottsdale to bring in people from all over the area. You've also got the Hispanic Heritage Day, 4,000 to 5,000 people participating. You've got vendors who sell food and clothing and entertainment. And it's the business of the economic activity of diversity and dialogue to put on those events. So, counsel, as I hear what you're saying, so I can understand, I like to boil things down from my head, is that you first assessed the purpose, and the purpose of this office was to increase diversity, and that to carry out its purpose, this office must engage in interstate commercial activity. Or economic. That seems to be getting lost, because it's clearly economic activity. And that's the word I meant to use. And I think that's how you're distinguishing Lamont, because you're saying Lamont's purpose was a house of worship, and to carry out that purpose, a church does not necessarily have to engage in interstate economic activity. Much like the home in Jones, where you're saying this office, and like the chief just said, I would only want to focus on this office, not the whole building, because I think there are issues with the indictment if we do that. You would say this office, to carry out that purpose, must engage in some form of interstate economic activity. Yes, or in activities that substantially affect. And I'm saying that when you have gatherings of 4,000 to 5,000 people who are, you know, participating in, you've got vendors there, you've got entertainment, you've got all these things going on, they are engaged in economic activity. They are bringing economic activity to the area, and they are engaging in economic and commercial activity. But I would urge the court, again, because the indictment charges 844I, 844I specifically says building or real property. And had we not put in where within the building, a bill of particulars would have been requested, and the bill of particulars would have said the Office of Diversity and Dialogue. Well, your indictment in the conspiracy count didn't allege, there's a difference between the two counts. Your indictment in the conspiracy count seems to allege the building, the whole building. That's correct. In the overt acts, it describes the particular, but it doesn't allege that particular portion. However, in the substantive second count, it does allege, make a difference. Office of Diversity. That's correct. I agree. Does the court have any other? Any further questions? Not at this time. Okay. And we realize, of course, that there are many other issues in the case, but they're well presented in the briefs. Yes. Thank you, counsel. Thank you. The notion that Section 844I can apply to property that's used not in commercial, but in economic activity is foreclosed by the Jones holding, page 855 of Jones, used in an activity affecting commerce. That qualification is most sensibly read to mean active employment for commercial, not economic, commercial purposes. That is the standard set forth in Jones. Broadening it out to economic simply flies in the face of that holding. And with respect to the idea about the issue of the constructive amendment, the government points out something that when the defense counsel said at a pretrial hearing about the building is implicated, well, perhaps that would go to a notice issue. But the restrictions of the constructive amendment doctrine don't only preserve the values of notice, it also preserves the right not to be convicted except upon a charge returned by a grand jury, the Sturone, the Supreme Court case of Sturone. So regardless of what was said at a pretrial hearing, that scope of that charge that's in the indictment returned by the grand jury sets the scope of what the defendant can be convicted of. The suggestion that, well, the business of a church is spiritual guidance, whereas the, quote-unquote, business of the city was to make Scottsdale a welcoming place, first of all, in the Lamont opinion, there is a footnote which refers to two cases from other circuits, Odom and Ray, and notes that in those opinions there were some use of that sort of language to discuss the, quote-unquote, business of a church. And what this Court said is, we take this Court, we take a law firm, we take the business of a church, and we have a less sweeping view of what constitutes business than those circuits do. And not surprisingly, I agree with that assumption. I think the Jones case is very clear that business is given a common, common sense interpretation under the language of the statute, and you don't say that that's a business because the church is pursuing the business of saving souls. As far as the question of to carry out its purpose, the city must engage in a lot of economic activity. I'll set aside the economic piece of that. I've just covered that. But again, Lamont addresses that. Every entity that does virtually anything in our society today has to engage in economic activity in order to pursue those goals. And what Lamont says is, that doesn't make it a business. That just makes it an entity doing what it's doing. The final, I think, important general point to bear in mind is, if the Court at the end of the day thinks it's ambiguous, it's still ambiguous, it's kind of a toss-up, it's a close call, well, then it's not a close call because, again, there are weighty interpretive principles. The avoidance doctrine, the Bass doctrine, the federal-state balance, the rule of lenity, those principles were weighty enough in Jones and in cases like Lamont and cases like Johnson to make it clear that the statute has to be given a narrow construction and the ambiguity has to be resolved in favor of preserving and protecting those important principles about the balance of powers in our federal system. Are there any questions?
judges: Thomas, Benavides, Owens